## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

DANIELLE OPITZ,

                Plaintiff,

v.                                                                      **COMPLAINT**

CONAGRA BRANDS, INC.

                Defendant.

## COMPLAINT

Plaintiff Danielle Opitz ("Plaintiff"), for her Complaint against Defendant Conagra Brands, Inc. ("Conagra Brands"), states and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for an award of damages and other relief on behalf of Plaintiff Danielle Opitz, a former employee of Defendant Conagra Brands.  Ms. Opitz was the victim of unlawful retaliation following her opposition to Defendant's unlawful, ongoing violations of federal safety standards adopted by OSHA set forth in specific, repeated complaints made by Ms. Opitz to Defendant's management representatives.  Ms. Opitz's complaints in this regard were made in furtherance of the Food Safety Modernization Act ("FSMA"), 21 U.S.C. Section 399d, et seq., as part of her efforts to prevent one or more violations of the FSMA.  This action arises under the anti-retaliation provisions of the FSMA, 21 U.S.C. Section 399d and the common law of the State of Iowa.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. Sections 1331, 1345, and 1391.

3.      This Court has personal jurisdiction over Defendant pursuant to 21 U.S.C. Section 399d, which provides that a complainant under the FSMA "may bring an action at law or equity for de novo review in the appropriate district court of the United States with jurisdiction, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury."

4.      This Court has supplemental jurisdiction over any claims made pursuant to the laws of the State of Iowa pursuant to 28 U.S.C. Section 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

5.      This action properly lies in the Southern District of Iowa pursuant to 28 U.S.C. Section 1391(b) on the basis that the claim arose in this judicial district.

## **PARTIES**

6.      Plaintiff is a resident of the State of Nebraska and a former employee of Defendant Conagra Brands.

7.      Defendant Conagra Brands is a corporation organized under the laws of the State of Delaware that makes and sells food products sold in supermarkets, restaurants, and food service establishments.   At its facility in Council Bluffs, Iowa, Conagra Brands manufactures and packages consumer frozen food products for distribution throughout the United States and employs more than 750 employees.   Conagra Brands is covered entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food as set forth in relevant anti-retaliation provisions of the Food Safety Modernization Act ("FSMA"), 21 U.S.C. Section 399d, et seq.  Conagra Brands is an employer for purposes of the Iowa Occupational Safety and Health Act contained within Chapter 88 of the Iowa Code.

### U.S. FOOD AND DRUG ADMINISTRATION AND FOOD SAFETY

8.     The Food, Drug, and Cosmetic ("FD&C") Act and its implementing regulations prohibit the adulteration or misbranding of food in interstate commerce, or the receipt, introduction, or delivery for introduction into interstate commerce of any food that is adulterated or misbranded.  21 U.S.C. § 301, et seq.  According to the FD&C Act, food is adulterated "if it has been prepared, packed, or held in unsanitary conditions in which it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 342(a)(4).

9.     The FSMA amended the FD&C Act by allowing for more effective prevention of food safety issues in the United States domestic food supply.  The FSMA empowers the U.S. Food and Drug Administration ("FDA") with broad authority to regulate the way foods are grown, harvested, processed, packaged, and sold.

10.     The FSMA's Preventive Controls for Human Food Rule requires that domestic food facilities that are required to register with Section 415 of the FD&C Act must comply with the requirements for risk-based preventive controls mandated by the FSMA.  The rule also creates new requirements for certain domestic and foreign facilities to establish and implement hazard analysis and risk-preventive controls for human food.   The rule implements the requirements of FSMA for covered facilities to have a food safety plan in place that includes an analysis of hazards and risk-based preventive controls to minimize or prevent identified hazards.  Specifically, the rule establishes requirements for a written food safety plan, hazard analysis, preventive controls, monitoring, corrective actions and corrections, verification, supply-chain program, recall plan, and associated records.  21 C.F.R. § 117, et seq.

11.     The Current Good Manufacturing Practices ("CGMP") enforced by the FDA provide systems help to ensure the safety of food production.  CGMP regulations generally address

matters including appropriate personal hygienic practices, design and construction of a food plant

grounds, plant equipment, sanitary operations, facility sanitation, and production and process

controls during the production of food.  21 C.F.R. § 117, et seq.

12.   Section 117.4 of the CGMP provides in relevant part:

Qualifications of individuals who manufacture, process, pack, or hold food.

(a) Applicability.  (1) The management of an establishment must ensure that all individuals who manufacture, process, pack, or hold food subject to subparts B and F of this part are qualified to perform their assigned duties.

(2) The owner, operator, or agent in charge of a facility must ensure that all individuals who manufacture, process, pack, or hold food subject to subpart C, D, E, F, OR G of this part are qualified to perform their assigned duties.

(b) Qualifications of all individuals engaged in manufacturing, processing, packing, or holding food.  Each individual engaged in manufacturing, processing, packing, or holding food (including temporary or seasonal personnel) or in the supervision thereof must:

(1) Be a qualified individual as that term is defined in 117.3 – i.e., have the education, training, or experience (or a combination thereof) necessary to manufacture, process, pack, or hold clean and safe as appropriate to the individual's assigned duties; and

(2) **Receive training in the principles of food hygiene and food safety, including the importance of employee health and personal hygiene, as appropriate to the food, the facility and the individual's assigned duties.**

(c)  **Additional qualifications of supervisory personnel. Responsibility for ensuring compliance with individuals with the requirements of this part must be clearly assigned to supervisory personnel who have the education, training, or experience (or a combination thereof) necessary to supervise the production of clean and safe food.**

(d) Records.  Records that document training required by paragraph (b)(2) of this section must be established and maintained.

21 C.F.R. § 117.4 (emphasis added)

13.     Section 117.10 of the CGMP provides in relevant part:

Personnel.

The management of the establishment must take reasonable measures and precautions to ensure the following:

(a) **Disease control.  Any person who, by medical examination or supervisory observation, is shown to have, or appears to have, an illness, open lesion, including boils, sores, or infected wounds, or any other abnormal source of microbial contamination by which there is a reasonable possibility of food, food-contact surfaces, or food-packaging materials becoming contaminated, must be excluded from any operations which may be expected to result in such contamination until the condition is corrected, unless conditions such as open lesions, boils, and infected wounds are adequately covered (e.g., by an impermeable cover). Personnel must be instructed to report such health conditions to their supervisors.**

(b) **Cleanliness.  All persons working in direct contact with food, food-contact surfaces, and food-packaging materials must conform to hygienic practices while on duty to the extent necessary to protect against allergen cross-contact and against contamination of food. The methods for maintaining cleanliness include:**

(1) **Wearing outer garments suitable to the operation in a manner that protects against allergen cross-contact and against the contamination of food, food-contact surfaces, or food-packaging materials.**

(2) **Maintaining adequate personal cleanliness.**

(3) **Washing hands thoroughly (and sanitizing if necessary to protect against contamination with undesirable microorganisms) in an adequate hand-washing facility before starting work, after each absence from the work station, and at any other time when the hands may have become soiled or contaminated.**

…

(5) **Maintaining gloves, if they are used in food handling, in an intact, clean, and sanitary condition.**

5

…

**(9) Taking any other necessary precautions to protect against allergen cross-contact and against contamination of food, food-contact surfaces, or food-packaging materials with microorganisms or foreign substances (including perspiration, hair, cosmetics, tobacco, chemicals, and medicines applied to the skin).**

21 C.F.R. § 117.10 (emphasis added)

14.     Section 117.20 of the CGMP provides in relevant part:

Plant and grounds.
…

**(b) <u>Plant construction and design</u>. The plant must be suitable in size, construction, and design to facilitate maintenance and sanitary operations for food-production purposes (*i.e.,* manufacturing, processing, packing, and holding). The plant must:**

**(1) Provide adequate space for such placement of equipment and storage of materials as is necessary for maintenance, sanitary operations, and the production of safe food.**

**(2) Permit the taking of adequate precautions to reduce the potential for allergen cross-contact and for contamination of food, food-contact surfaces, or food-packaging materials with microorganisms, chemicals, filth, and other extraneous material. The potential for allergen cross-contact and for contamination may be reduced by adequate food safety controls and operating practices or effective design, including the separation of operations in which allergen cross-contact and contamination are likely to occur, by one or more of the following means: location, time, partition, air flow systems, dust control systems, enclosed systems, or other effective means.**

…

**(4) Be constructed in such a manner that floors, walls, and ceilings may be adequately cleaned and kept clean and kept in good repair; that drip or condensate from fixtures, ducts and pipes does not contaminate food, food-contact surfaces, or food-packaging materials; and that aisles or working spaces are provided between equipment and walls and are adequately**

**unobstructed and of adequate width to permit employees to perform their duties and to protect against contaminating food, food-contact surfaces, or food-packaging materials with clothing or personal contact.**

…

**(6) Provide adequate ventilation or control equipment to minimize dust, odors and vapors (including steam and noxious fumes) in areas where they may cause allergen cross-contact or contaminate food; and locate and operate fans and other air-blowing equipment in a manner that minimizes the potential for allergen cross-contact and for contaminating food, food-packaging materials, and food-contact surfaces.**

…

21 C.F.R. § 117.20 (emphasis added)

15.     Section 117.35 of the CGMP provides in relevant part:

Sanitary Operations.

**(a) <u>General maintenance</u>. Buildings, fixtures, and other physical facilities of the plant must be maintained in a clean and sanitary condition and must be kept in repair adequate to prevent food from becoming adulterated. Cleaning and sanitizing of utensils and equipment must be conducted in a manner that protects against allergen cross-contact and against contamination of food, food-contact surfaces, or food-packaging materials.**

…

**(d) <u>Sanitation of food-contact surfaces</u>. All food-contact surfaces, including utensils and food-contact surfaces of equipment, must be cleaned as frequently as necessary to protect against allergen cross-contact and against contamination of food.**

**(1) Food-contact surfaces used for manufacturing/processing, packing, or holding low-moisture food must be in a clean, dry, sanitary condition before use. When the surfaces are wet-cleaned, they must, when necessary, be sanitized and thoroughly dried before subsequent use.**

(2) **In wet processing, when cleaning is necessary to protect against allergen cross-contact or the introduction of microorganisms into food, all food-contact surfaces must be cleaned and sanitized before use and after any interruption during which the food-contact surfaces may have become contaminated. Where equipment and utensils are used in a continuous production operation, the utensils and food-contact surfaces of the equipment must be cleaned and sanitized as necessary.**

(3) Single-service articles (such as utensils intended for one-time use, paper cups, and paper towels) must be stored, handled, and disposed of in a manner that protects against allergen cross-contact and against contamination of food, food-contact surfaces, or food-packaging materials.

(e) <u>**Sanitation of non-food-contact surfaces**</u>**. Non-food-contact surfaces of equipment used in the operation of a food plant must be cleaned in a manner and as frequently as necessary to protect against allergen cross-contact and against contamination of food, food-contact surfaces, and food-packaging materials.**

(f) <u>**Storage and handling of cleaned portable equipment and utensils**</u>**. Cleaned and sanitized portable equipment with food-contact surfaces and utensils must be stored in a location and manner that protects food-contact surfaces from allergen cross-contact and from contamination.**

21 C.F.R. § 117.35 (emphasis added)

16.     Section 117.37 of the CGMP provides in relevant part:

Sanitary facilities and controls.

Each plant must be equipped with adequate sanitary facilities and accommodations including:

…

(e) <u>**Hand-washing facilities**</u>**. Each plant must provide hand-washing facilities designed to ensure that an employee's hands are not a source of contamination of food, food-contact surfaces, or food-packaging materials, by providing facilities that are adequate, convenient, and furnish running water at a suitable temperature.**

21 C.F.R. § 117.35 (emphasis added)

17.    Section 117.40 of the CGMP provides in relevant part:

Equipment and utensils.

(a)(1) **All plant equipment and utensils used in manufacturing, processing, packing, or holding food must be so designed and of such material and workmanship as to be adequately cleanable, and must be adequately maintained to protect against allergen cross-contact and contamination.**

(2) Equipment and utensils must be designed, constructed, and used appropriately to avoid the adulteration of food with lubricants, fuel, metal fragments, contaminated water, or any other contaminants.

(3) **Equipment must be installed so as to facilitate the cleaning and maintenance of the equipment and of adjacent spaces.**

(4) Food-contact surfaces must be corrosion-resistant when in contact with food.

(5) Food-contact surfaces must be made of nontoxic materials and designed to withstand the environment of their intended use and the action of food, and, if applicable, cleaning compounds, sanitizing agents, and cleaning procedures.

(6) **Food-contact surfaces must be maintained to protect food from allergen cross-contact and from being contaminated by any source, including unlawful indirect food additives.**

(b) Seams on food-contact surfaces must be smoothly bonded or maintained so as to minimize accumulation of food particles, dirt, and organic matter and thus minimize the opportunity for growth of microorganisms and allergen cross-contact.

(c) **Equipment that is in areas where food is manufactured, processed, packed, or held and that does not come into contact with food must be so constructed that it can be kept in a clean and sanitary condition.**

…

21 C.F.R. § 117.40 (emphasis added)

18.    Section 117.80 of the CGMP provides in relevant part:

Process and controls.

(a) **General**. **(1) All operations in the manufacturing, processing, packing, and holding of food (including operations directed to receiving, inspecting, transporting, and segregating) must be conducted in accordance with adequate sanitation principles.**

(2) **Appropriate quality control operations must be employed to ensure that food is suitable for human consumption and that food-packaging materials are safe and suitable.**

(3) **Overall sanitation of the plant must be under the supervision of one or more competent individuals assigned responsibility for this function.**

(4) **Adequate precautions must be taken to ensure that production procedures do not contribute to allergen cross-contact and to contamination from any source.**

(5) **Chemical, microbial, or extraneous-material testing procedures must be used where necessary to identify sanitation failures or possible allergen cross-contact and food contamination.**

(6) All food that has become contaminated to the extent that it is adulterated must be rejected, or if appropriate, treated or processed to eliminate the contamination.

…

(c) **Manufacturing operations**. **(1) Equipment and utensils and food containers must be maintained in an adequate condition through appropriate cleaning and sanitizing, as necessary. Insofar as necessary, equipment must be taken apart for thorough cleaning.**

(2) **All food manufacturing, processing, packing, and holding must be conducted under such conditions and controls as are necessary to minimize the potential for the growth of microorganisms, allergen cross-contact, contamination of food, and deterioration of food.**

…

(5) **Work-in-process and rework must be handled in a manner that protects against allergen cross-contact, contamination, and growth of undesirable microorganisms.**

…

**(7) Equipment, containers, and utensils used to convey, hold, or store raw materials and other ingredients, work-in-process, rework, or other food must be constructed, handled, and maintained during manufacturing, processing, packing, and holding in a manner that protects against allergen cross-contact and against contamination.**

…

21 C.F.R. § 117.80 (emphasis added)

19.     Section 117.93 of the CGMP provides in relevant part:

Warehousing and distribution.

Storage and transportation of food must be under conditions that will protect against allergen cross-contact and against biological, chemical (including radiological), and physical contamination of food, as well as against deterioration of the food and the container.

21 C.F.R. § 117.93

20.     Section 117.130 of the CGMP provides in relevant part:

Hazard analysis.

**(a) <u>Requirement for a hazard analysis</u>. (1) You must conduct a hazard analysis to identify and evaluate, based on experience, illness data, scientific reports, and other information, known or reasonably foreseeable hazards for each type of food manufactured, processed, packed, or held at your facility to determine whether there are any hazards requiring a preventive control.**

**(2) The hazard analysis must be written regardless of its outcome.**

**(b) <u>Hazard identification</u>. The hazard identification must consider:**

**(1) Known or reasonably foreseeable hazards that include:**

**(i) Biological hazards, including microbiological hazards such as parasites, environmental pathogens, and other pathogens;**

(ii) Chemical hazards, including radiological hazards, substances such as pesticide and drug residues, natural toxins, decomposition, unapproved food or color additives, and food allergens; and

(iii) Physical hazards (such as stones, glass, and metal fragments); and

(2) **Known or reasonably foreseeable hazards that may be present in the food for any of the following reasons:**

(i) **The hazard occurs naturally;**

(ii) **The hazard may be unintentionally introduced; or**

(iii) The hazard may be intentionally introduced for purposes of economic gain.

(c) <u>Hazard evaluation</u>. **(1)(i) The hazard analysis must include an evaluation of the hazards identified in paragraph (b) of this section to assess the severity of the illness or injury if the hazard were to occur and the probability that the hazard will occur in the absence of preventive controls.**

(ii) **The hazard evaluation required by paragraph (c)(1)(i) of this section must include an evaluation of environmental pathogens whenever a ready-to-eat food is exposed to the environment prior to packaging and the packaged food does not receive a treatment or otherwise include a control measure (such as a formulation lethal to the pathogen) that would significantly minimize the pathogen.**

(2) **The hazard evaluation must consider the effect of the following on the safety of the finished food for the intended consumer:**

(i) The formulation of the food;

(ii) **The condition, function, and design of the facility and equipment;**

(iii) Raw materials and other ingredients;

(iv) Transportation practices;

(v) **Manufacturing/processing procedures**;

12

(vi) Packaging activities and labeling activities;

(vii) Storage and distribution;

(viii) Intended or reasonably foreseeable use;

(ix) **Sanitation, including employee hygiene**; and

(x) Any other relevant factors, such as the temporal (*e.g.,* weather-related) nature of some hazards (*e.g.,* levels of some natural toxins).

21 C.F.R. § 117.130 (emphasis added)

21.     Section 117.135 of the CGMP provides in relevant part:

Preventive controls.

(a)(1) **You must identify and implement preventive controls to provide assurances that any hazards requiring a preventive control will be significantly minimized or prevented and the food manufactured, processed, packed, or held by your facility will not be adulterated under section 402 of the Federal Food, Drug, and Cosmetic Act or misbranded under section 403(w) of the Federal Food, Drug, and Cosmetic Act.**

(2) Preventive controls required by paragraph (a)(1) of this section include:

(i) Controls at critical control points (CCPs), if there are any CCPs; and

(ii) Controls, other than those at CCPs, that are also appropriate for food safety.

(b) Preventive controls must be written.

(c) Preventive controls include, as appropriate to the facility and the food:

(1) <u>**Process controls**</u>**. Process controls include procedures, practices, and processes to ensure the control of parameters during operations such as heat processing, acidifying, irradiating, and refrigerating foods. Process controls must include, as appropriate to the nature of the applicable control and its role in the facility's food safety system:**

13

(i) **Parameters associated with the control of the hazard; and**

(ii) **The maximum or minimum value, or combination of values, to which any biological, chemical, or physical parameter must be controlled to significantly minimize or prevent a hazard requiring a process control.**

…

(3) <u>**Sanitation controls**</u>**. Sanitation controls include procedures, practices, and processes to ensure that the facility is maintained in a sanitary condition adequate to significantly minimize or prevent hazards such as environmental pathogens, biological hazards due to employee handling, and food allergen hazards. Sanitation controls must include, as appropriate to the facility and the food, procedures, practices, and processes for the:**

(i) **Cleanliness of food-contact surfaces, including food-contact surfaces of utensils and equipment;**

(ii) **Prevention of allergen cross-contact and cross-contamination from insanitary objects and from personnel to food, food packaging material, and other food-contact surfaces and from raw product to processed product.**

(4) <u>Supply-chain controls</u>. Supply-chain controls include the supply-chain program as required by subpart G of this part.

(5) <u>Recall plan</u>. Recall plan as required by 117.139.

(6) <u>**Other controls**</u>**. Preventive controls include any other procedures, practices, and processes necessary to satisfy the requirements of paragraph (a) of this section. Examples of other controls include hygiene training and other current good manufacturing practices.**

## **FSMA WHISTLEBLOWER PROTECTIONS**

22.     The FSMA protects employees from discharge or other retaliation by their

employers for making good faith complaints about food safety, food production safety, or other

violations of the FD&C Act.  In this regard, the FSMA provides:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privilege of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee) –
>
> (1) **provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter;**
>
> (2) testified or is about to testify in a proceeding concerning such violation;
>
> (3) assisted or participated or is about to assist or participate in such a proceeding; or
>
> (4) **objected to, refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this chapter, or any order, rule, regulation, standard, or ban under this chapter.**

21 U.S.C. § 399d (emphasis added)

23.     An employee who believes that he or she has been retaliated against in violation of

FSMA may file a complaint alleging such retaliation within 180 days after an alleged violation of

FSMA occurs.  29 C.F.R. § 1987.103(a), (d).

24.     Upon receipt of a complaint alleging retaliation in violation of FSMA, OSHA will conduct an investigation of the allegations included in the complaint.  29 C.F.R. § 1987.104, et seq.

25.     A Plaintiff must make "a prima facie showing (i.e. non-frivolous allegation) that a protected activity was a contributing factor in the adverse action alleged in the complaint."  29 C.F.R. § 1987.104(e)(1).   FSMA's implementing regulations provide in relevant part:

> [T]he Plaintiff will be considered to have met the required burden if the complaint on its face, supplemented as appropriate through interviews of the Plaintiff, alleges the existence of facts and either direct or circumstantial evidence to meet the required showing, i.e., to give rise to an inference that the Defendant knew or suspected that the employee engaged in protected activity and that the protected activity was a contributing factor in the adverse action. The burden may be satisfied, for example, if the complaint shows that the adverse action took place within a temporal proximity of the protected activity, or at the first opportunity available to the Defendant, giving rise to the inference that it was a contributing factor in the adverse action.

29 C.F.R. § 1987.104(e)(3)

**COVID-19**

26.     On January 31, 2020, the U.S. Department of Health and Human Services ("HHS") issued a declaration of a public health emergency related to SARS CoV-2, the virus that causes Coronavirus Disease 2019 ("COVID-19") pursuant to the Public Health Service Act (42 U.S.C. 247d) and mobilized the Operating Divisions of HHS.[1]

27.     On March 11, 2020, the World Health Organization designated COVID-19 as a pandemic.[2]

---

[1] Secretary of Health and Hunan Services Alex M. Azar II, Determination that a Public Health Emergency Exists (Jan. 31, 2020), *available at* *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx*

[2] WHO Director-General opening remarks at media Briefing on COVID-19 (March 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

28.     On March 13, 2020, the White House issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak pursuant to Sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 et seq.) and consistent with Section 1135 of the Social Security Act (42 U.S.C. 1320b-5).

29.     On March 16, 2020, OSHA released Guidance on Preparing Workplaces for COVID-19 with directives to employers related to implementation of basic infection and workplace safety measures.[3]  OSHA's guidance provided in relevant part:

> To reduce the impact of COVID-19 outbreak conditions on businesses, workers, customers, and the public, it is important for all employers to plan now for COVID-19. For employers who have already planned for influenza pandemics, planning for COVID-19 may involve updating plans to address the specific exposure risks, sources of exposure, routes of transmission, and other unique characteristics of SARS-CoV-2 (i.e., compared to pandemic influenza viruses). **Employers who have not prepared for pandemic events should prepare themselves and their workers as far in advance as possible of potentially worsening outbreak conditions. Lack of continuity planning can result in a cascade of failures as employers attempt to address challenges of COVID-19 with insufficient resources and workers who might not be adequately trained for jobs they may have to perform under pandemic conditions.**
>
> The Occupational Safety and Health Administration (OSHA) developed this COVID-19 planning guidance based on traditional infection prevention and industrial hygiene practices. **It focuses on the need for employers to implement engineering, administrative, and work practice controls and personal protective equipment (PPE), as well as considerations for doing so.**

30.     On March 18, 2020, the United States Department of Homeland Security ("DHS") issued Guidance on the Essential Critical Infrastructure Workforce:  Ensuring Community and

---

[3] https://www.osha.gov/Publications/OSHA3990.pdf

National Resilience in COVID-19.[4]   The guidance provided that workers in the Food and Agriculture sector – agricultural production, food processing, distribution, retail and food service and allied industries – were named as essential infrastructure workers.  On March 28, DHS issued its Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response.[5]   The memorandum included an advisory list of "workers who conduct a range of operations and services that are typically essential to continued critical infrastructure viability" that specifically identified as essential workers "food manufacturer workers and their supplier workers including those employed at food ingredient production and processing facilities."

31.     On April 20, 2020, the CDC issued interim guidance Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19.[6]   The guidance "pertains to critical infrastructure workers, including personnel in 16 different sectors of work including…workers in food and agriculture facilities." The guidance provided in relevant part:

> To ensure continuity of operations of essential functions, CDC advises that critical infrastructure workers may be permitted to continue to work following potential exposure to COVID-19, provided they remain asymptomatic and additional precautions are implemented to protect them and the community.

---

[4] https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19
[5] https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_1.pdf
[6] https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html

## PLAINTIFF'S EMPLOYMENT AND TERMINATION

32.     Plaintiff Danielle Opitz began her employment as a registered nurse at the Conagra Brands production facility in Council Bluffs, Iowa, on July 22, 2019.   In January 2020, Ms. Opitz was promoted to the position of Health Services Nurse Supervisor.   In this role, she reported to Environmental Health & Safety ("EHS") Manager Bill Latenser from the time of her promotion until March 19, 2020.

33.     In December 2019, the facility conducted and failed a Health Services internal audit.   The internal audit revealed Health Services failures in areas that included OSHA recordkeeping, bloodborne pathogen initial and annual training, job safety and functionality analysis and renewal, and hazardous waste initial and annual training.   The internal audit also revealed that OSHA recordables were not entered into OSHA Intelex recordkeeping software or reported to relevant authorities in the State of Iowa.   Following her promotion to Health Services Nurse Supervisor in January 2020, Ms. Opitz was tasked with resolving the issues raised in the internal audit, and as part of these efforts Ms. Opitz independently raised other OSHA compliance-related concerns related to employee and food production safety.

34.     From February 10 until March 9, 2020, Ms. Opitz expressed serious concerns to EHS Manager Bill Latenser regarding the absence of meaningful preparation at the facility for workplace issues related to the inevitable threat of COVID-19.   She specifically raised concerns regarding numerous subjects that included:

· employee safety;
· food production safety;
· insufficient supplies of personal protective equipment ("PPE");
· disinfection protocols in all areas of the plant, including food production and packaging areas;
· sanitation protocols in all areas of the plant, including food production and packaging areas;

- employee distancing protocols in all areas of the plant, including food production and packaging areas;

- restriction of non-essential visitors and contractors, including suspension of plant tours;

- screening tools for plant visitors, new hire employees, and employees returning to work from leaves of absence;

- tracking of domestic and international travel plans for employees; and

- failure to adequately educate or instruct employees regarding COVID-19 or necessary guidelines and protocols.

35.   In response to Ms. Opitz's concerns, Bill Latenser acknowledged the facility's general lack of preparedness and agreed that senior plant leadership needed to immediately begin preparations to address employee and food production safety.  He also agreed that members of the Health Services team needed to be prepared to lead the facility's efforts to prepare the facility for COVID-19.  Throughout February and early March, Ms. Opitz expressed frustration that her opinions as a medical professional were not being considered.  Ms. Opitz specifically complained that employees' lives would soon be at risk and food production safety at the facility was in serious jeopardy.  Ms. Opitz insisted that Mr. Latenser must elevate her concerns to members of senior plant leadership.  In response to these regular concerns raised by Ms. Opitz, Mr. Latenser assured her that senior plant leadership was aware of COVID-19's potential impact on employee and food production safety and agreed to elevate her concerns to those to whom he reported.

36.   On March 9, Ms. Opitz expressed concerns to Bill Latenser and her nurse colleague Jamie Bishop regarding inefficiencies in plant safety in preparation for COVID-10.  Ms. Opitz recommended again that the plant must limit and monitor plant visitors, increase sanitation and disinfection efforts, educate employees more deliberately on COVID-19 and its symptoms and treatment, and adopt more transparent guidelines and protocols for employee and food production safety.  Mr. Latenser and Ms. Bishop agreed with her recommendations and agreed that additional steps must be taken immediately in response to the threat posed by COVID-19.

37.     A plant tour attended by more than 30 members of senior leadership from plants across the country was conducted the same day without notice to members of Health Services. Ms. Opitz and Jamie Bishop approached Bill Latenser when they learned of the tour and advised him that it should not be conducted because it posed a reckless and unnecessary threat to employees and food production safety.   Mr. Latenser apologized for failing to advise members of Health Services about the tour and agreed to more directly involve Ms. Opitz and Ms. Bishop in discussions among members of senior leadership about workplace preparedness for COVID-19. Later the same day Ms. Opitz advised Mr. Latenser that members of Health Services had no access to available PPE at the plant, that both the Health Services and Environmental Health & Safety Departments had run out of disinfecting spray and wipes, and that the plant was unable to source these materials in area stores or online.

38.     On March 10, Ms. Opitz was invited to address a senior leadership meeting attended by Plant Manager Jon Sundstrom, Assistant Plant Manager Mike Palmer, Manager of Plant Quality John Rathfon, HR Generalist Sara Kucera, and Bill Latenser regarding COVID-19 and Health Services recommendations for necessary precautions related to employee and food production safety.   After the meeting Ms. Kucera came to Ms. Opitz's office and asked about steps that had already been taken at the plant in response to threats posed by COVID-19.   In response, Ms. Opitz advised Ms. Kucera that very few precautions had been taken, that she had been raising concerns on this subject for weeks without success, and that significant efforts should be immediately undertaken to protect employees and food production.   Later the same day, Assistant Plant Manager Mike Palmer convened an emergency meeting related to sanitation preparations for COVID-19 attended by Mr. Sundstrom, Mr. Rathfon, Mr. Latenser, Ms. Kucera, and Ms. Opitz.

39.     On March 18, Ms. Opitz again advised Bill Latenser that Health Services had no access to any available PPE, that Health Services had run out of disinfecting spray and wipes, and that the plant was unable to source these materials in area stores or online.  Mr. Latenser instructed Ms. Opitz to try to source these items locally, but she was unable to do so.  On March 20, Mr. Latenser began to work exclusively from home, citing his concern for the threat of contracting COVID-19 in the course of his duties at work.  From March 20 until April 7, Ms. Opitz was the sole remaining EHS representative on site at the facility.

40.     On March 23, Ms. Opitz sent Occupational Health Manager Julie Lecci an email asking about her availability to discuss Ms. Opitz's concerns about insufficient COVID-19 related guidelines and protocols for employee and food production.  Ms. Optiz spoke to Ms. Lecci later that evening and explained that she was concerned about the absence of leadership in Health Services after Mr. Latenser's departure from the facility.  She also expressed frustration that her opinions as a medical professional were not being considered and that senior leadership had refused to take her numerous complaints about insufficient COVID-19 related guidelines and protocols seriously after she had first raised these issues at the senior leadership meeting on March 9.  Ms. Lecci explained in response that she felt that "corporate guidance will be issued very soon." Ms. Opitz expressed her concern about a potential outbreak in her nursing staff, insisted that additional Health Services resources were required, and explained to Ms. Lecci that preparations must begin immediately.  In response Ms. Lecci said only that "occupational nursing is different from hospital nursing and sometimes we just have to take a back seat.  She added "sometimes occupational nursing isn't for everyone, but we'll keep in touch if you have additional concerns."

41.     Following a COVID-19 leadership meeting on April 10, Plant Manger Jon Sundstrom advised Ms. Opitz that in the absence of on-site leadership in Health Services, Ms.

Opitz and her colleagues in Health Services would thereafter report to Human Resources Manager Sarah Bradley.   In the weeks that followed Ms. Opitz repeatedly raised with Ms. Bradley her ongoing concerns regarding inadequate preparation at the facility for workplace issues related to COVID-19 without significant feedback or progress.   Soon thereafter Ms. Bradley began to unnecessarily criticize Health Services staffing and question Ms. Opitz on various Health Services efforts related to preparation for COVID-19.   The working relationship between Ms. Opitz and Ms. Bradley deteriorated rapidly.   Later in April Ms. Bradley informed Bill Latenser that she would complete Ms. Opitz's annual review that was scheduled to be completed by the end of the month for the previous fiscal year.   At the time of Ms. Bradley's annual review of Ms. Opitz's performance, Ms. Optiz had reported to her for six days.

42.   On April 29, Ms. Opitz and Ms. Bradley spoke by phone, and during their conversation Ms. Opitz expressed her frustration with the manner in which they had interacted since she began reporting to Ms. Bradley.   During the conversation Ms. Opitz cried as she explained that Ms. Bradley had been unnecessarily aggressive with her since she began reporting to her on April 10, and that she felt that she was being undermined in her ability to fulfill her duties as Nurse Manager.   She expressed that she should perhaps provide her two-week notice because Ms. Bradley did not seem to appreciate her efforts as Nurse Manager in extraordinarily difficult circumstances.   Ms. Bradley apologized and explained that she has "different expectations."   Ms. Bradley explained that she would be back at the plant the following day and that they could talk further about Ms. Opitz's concerns when she returned.

43.   When Ms. Opitz arrived on April 30, she was asked to attend a meeting in Sarah Bradley's office with Plant Manager Jon Sundstrom.   Though she had not offered her resignation and expected to discuss the concerns she had raised the previous day, Ms. Bradley said "we are

going to move forward with your two-week notice" and "we need to talk about transitioning your tasks over to the other nurses."  In response Ms. Opitz said "ok, but this is a terrible time to leave – during a pandemic.  I can't leave my nurses."  She explained to Ms. Bradley and Mr. Sundstrom that she was concerned that Health Services would suffer if she left her position and that she felt the associates at the facility needed her.  She explained also that "all [she] ever wanted was to do is be a nurse and work as a healthcare professional."  She then said that each time she raised concerns about inadequate preparation at the facility for workplace issues related to COVID-19 she felt hostility about her concerns from those to whom she had reported them, including Ms. Bradley.  Ms. Opitz explained that she felt her efforts were unfairly and unnecessarily scrutinized, and that Ms. Bradley had been openly hostile to her throughout the time she had reported to her. Ms. Bradley then asked Ms. Opitz to "write down your tasks and provide a checklist for each one." After Ms. Opitz began crying, she said again that she felt that she would be "putting [her] nurses in a bad situation if [she] left."  Ms. Bradley said only in response that she would "start the transition immediately."

44.     After their meeting Ms. Opitz returned to her office and encountered her colleague Christy Anville, who was not scheduled to be at work.  When Ms. Opitz asked her why she was there, Ms. Anville replied "I have no idea why I'm here.  Sarah Bradley called me yesterday afternoon and asked if I could come into work at 9 a.m. today."  Later Ms. Anville explained that after she asked Ms. Bradley why she had been asked to report to work, Ms. Bradley informed her that she "wanted you to start transitioning work to me."

45.     On May 1, Ms. Opitz met with Plant Manager Jon Sundstrom and Senior HR Generalist Sarah Kucera at her request.  At the meeting Ms. Opitz detailed numerous concerns regarding employee safety, food production safety, retaliation in the form of unreasonable scrutiny

by Sarah Bradley after she raised concerns about COVID-19 preparations and response, confidentiality of employee health records and information, and other related subjects.  At the meeting Ms. Opitz also insisted that she was forced to provide her two-week notice against her wishes and at the instruction of Ms. Bradley.  Ms. Opitz explained that she did not want to resign her position with Conagra Brands.  During the meeting Ms. Kucera took notes that she later declined to provide to Ms. Opitz.  Mr. Sundstrom explained that he would follow-up with Ms. Opitz on Monday, May 4 to address the issues she had raised.

46.     On May 4, Ms. Opitz met with Sarah Bradley in her office and asked why Health Services had not been consulted in return to work screening at the facility.  Ms. Bradley explained that Occupational Health Manager Julie Lecci was directing these efforts.  Ms. Opitz expressed frustration that Health Services was not involved in a meaningful way, and insisted that her nursing staff should have been utilized in this process.

47.     On May 5, Ms. Opitz exchanged emails with Julie Lecci regarding return to work screening with copies to Plant Manager Jon Sundstrom, Assistant Plant Manager Mike Palmer, Sarah Bradley, and Bill Latenser.  In her final email on this subject to Ms. Lecci, Ms. Opitz explained:

> Thank you for explaining the purpose, however, that still doesn't explain why Health Services wasn't involved in the return to work guidance and provided a copy of the questionnaire prior to it being distributed.  When there isn't transparency between the different departments it shows gaps in leadership which in turn makes HS look unprofessional and unorganized.  I was put in this position yesterday afternoon when an associated presented to HS because of his answers from the screening tool and I was unaware of what was going on.
>
> Could you please provide clarification if Health Services should be involved or provided guidance on the first day back pre-shift screening?  I just want to make sure I am giving clear direction to my team!

Thank you!

48.     The same day Conagra Union Representative Barbara Gamache came to Ms. Opitz's office and expressed her concern that employees were not being notified when someone in their work area has tested positive for COVID-19, placing them at risk for workplace exposure. She explained further that she was concerned by the general lack of communication from senior management regarding testing, exposure, and employee health and safety more generally.   In response Ms. Optiz explained that she was unable to provide her with additional information because Health Services had been excluded from the testing and reporting efforts, and that Hunan Resources and senior leadership were handling testing without direction or assistance from Health Services.   Ms. Gamache asked why Human Resources was involved in testing and reporting of COVID-19 cases at the facility and questioned why Human Resources representatives had access to employees' medical information and test results.   Ms. Opitz advised her to direct questions to her Union representatives.   After Ms. Gamache contacted Union representatives, BCTGM Local 50g Business Agent Rob Down contacted Ms. Opitz and asked for OSHA-related information, which Ms. Opitz later provided to Mr. Down by email.

49.     Later on May 5, Ms. Opitz spoke with Bill Latenser by phone to seek guidance regarding the issues she had raised with Jon Sundstrom and Sarah Kucera on May 1, including her numerous concerns regarding employee safety, food production safety, and retaliation in the form of unreasonable scrutiny by Sarah Bradley after she raised concerns about COVID-19 preparations and response.   She explained that she had been set up by Ms. Bradley in a meeting with Mr. Sundstrom on April 30 to force her resignation.   Mr. Latenser asked whether she had provided anything in writing to Ms. Bradley before they met that day and Ms. Opitz explained that they had not.   She explained to him that she would "never quit during a pandemic because the associates

and nurses need me," and because "COVID has just started to hit the plant."  She told Mr. Latenser

that she knows Ms. Bradley wants her "out of Conagra."  In response Mr. Latenser said he was

surprised to learn of her resignation and acknowledged that Ms. Bradley wanted Ms. Opitz to

leave.  He explained that two weeks before, Ms. Bradley had instructed him not to complete Ms.

Opitz's annual review because she intended to complete it herself.  He expressed his regret that

Ms. Opitz had been put in this position and praised her work and dedication as Nurse Manager.

Ms. Opitz told Mr. Latenser "I have never worked so hard to prove I can do my job.  I want to be

able to.  I have been in fear in the past few months that my nursing license would be compromised

because senior management and Sarah Bradley will not provide me with the information I need to

be successful.  They have purposefully withheld information related to COVID positive associates,

medical documentation, COVID test results, associate follow-ups."  She explained that she needed

to "file a legal action" and asked how she should do that.  In response Mr. Latenser said he would

"reach out to some contacts I have in mind at Conagra and get back to you."  She thanked him for

his guidance.  Mr. Latenser did not provide the names or contacts details for anyone at Conagra

that could assist her.

        50.     On May 6, Ms. Opitz sent an email to Conagra Legal Compliance and Ethics

representatives (legalcomplianceandethics@conagra.com) with copies to Jon Sundstrom and Bill

Latenser seeking to file a Code of Conduct complaint in an effort to protect herself from the

retaliation she had experienced after she raised concerns about the facility's inadequate COVID-

19 preparations and response.  The email read:

> I require assistance with legal council [sic] as it pertains to
> Conagra's Code of Conduct violations.  Could you please provide
> guidance on how I would move forward immediately on filing a
> claim?

        51.     The following morning Ms. Opitz sent an email to Bill Latenser that read:

Hi Bill!

I hope you are having a great morning!  Can you please call me as soon as you can, I have a lot of concerns and I need to talk to someone who can help me.  Thank you!

52.     Later the same day, Human Resources Director Robbyn Linville called Ms. Opitz by phone in response to the Code of Conduct complaint she had submitted the day before.  Ms. Opitz explained her continuing concerns regarding employee safety, food production safety, her forced resignation, and retaliation by Sarah Bradley after she raised concerns about the facility's COVID-19 preparations and response.  Ms. Linville acknowledge her concerns, described them as "very valid," and explained that her complaint would need to be "investigated thoroughly in an internal investigation"  Ms. Linville invited Ms. Opitz to speak directly with her at her office in Omaha on Monday, May 11 to "go over all of the details," and Ms. Opitz agreed to do so.  Ms. Linville then explained that she would be in touch about a specific time for their meeting.

53.     On May 9, Ms. Opitz sent an email to Julie Lecci, her nurse colleague Jamie Bishop, and Environment, Safety & Health Registered Nurse Shelley Marshall that read:

Good afternoon,

I am reaching out regarding new or updated guidance on ConAgra's COVID Plant Protocol.  The last protocol Health Services received was 4/8/20.  Has there been any new direction since?

In Health Services, we are experiencing an escalating increase on associates being sent of our illness.  Can you please provide updated direction and guidance on what Conagra's expectations are during this pandemic?  And expectations and protocol for follow-up for associates who are out sick?

Thank you!

54.     At 8:30 a.m. on Monday, May 11, Plant Manager Jon Sundstrom and Human Resources Manager Sarah Bradley arrived at Ms. Opitz's office.  Ms. Bradley told her "Danielle, Conagra feels you no longer have the best interest of the company and we want you to grab your

personal items and you will not be allowed on the Conagra premises.  We will pay you through

May 20, 2020." Ms. Bradley instructed Ms. Opitz "do not to have any contact with the nurses or

other staff regarding Conagra."   Ms. Bradley then handed Ms. Opitz her business card, took

possession of her keycard and key, and instructed her not to log off of her computer.  Ms. Opitz

was then escorted from the facility.

55.     On May 14, Sarah Bradley sent an email to senior leadership that read:

> Good morning.  I want to inform you that Danielle Opitz the Team
> Lead for Health Services has resigned.  Over the next few weeks
> we're interviewing candidates for a permanent backfill of the role.
> In the meantime, I ask for your patience as we're going to have some
> new faces learning to support the plant and will likely incur some
> closures of the Health Services office.  We remain committed to
> providing the professional healthcare support you've come to expect
> and will have a permanent solution as soon as possible.
>
> Please share with your teams as you see necessary.

## COUNT ONE – VIOLATION OF 21 U.S.C. § 399d

56.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

57.     Plaintiff was an employee of Defendant Conagra Brands, Inc.

58.     Conagra Brands is vicariously liable for the actions of their employees and agents.

59.     Conagra Brands is covered entity engaged in the manufacture, processing, packing,

transporting, distribution, reception, holding, or importation of food as set forth in relevant anti-

retaliation provisions of the FSMA, 21 U.S.C. Section 399d, et seq.

60.     Plaintiff in good faith engaged in protected activities or conduct within the meaning

of the FMSA by providing or causing to be provided to Conagra Brands information relating to

any violation of, or any act or omission that she reasonably believed to be a violation of the FSMA,

including any order, rule, regulation, standard, or ban under the FSMA.

61.     Plaintiff also in good faith engaged in protected activities or conduct within the meaning of the FSMA by objecting to and refusing to participate in activities, policies, practices, and/or assigned tasks that she reasonably believed to be in violation of the FSMA, including any order, rule, regulation, standard, or ban under the FSMA.

62.     Conagra Brands and its agents knew that Plaintiff engaged in protected activities or conduct within the meaning of the FMSA.

63.     Plaintiff suffered an unfavorable personnel action when her employment was terminated on May 11, 2020.

64.     The reasons cited by Conagra Brands for the termination of Plaintiff's employment constitute pretext for unlawful retaliation against Plaintiff because she engaged in a lawful act by engaging in protected activities or conduct within the meaning of the FMSA.

65.     The circumstances as described herein are sufficient to raise the inference that Plaintiff's protected activity was a contributing factor in Defendant's decision to retaliate against Plaintiff and in Defendant's decision to terminate her employment.

66.     As a direct and proximate result of Defendant's actions, Plaintiff has been deprived of income and other monetary and non-monetary benefits for which she is entitled to recover from Defendant as damages, pursuant to 21 U.S.C. 399d(b)(4) (B)(ii).

67.     As a further direct and proximate result of Defendant's actions, Plaintiff has suffered humiliation, emotional pain, distress, suffering, inconvenience, mental anguish, and related non-economic damages for which she is entitled to recover from Defendant as damages, as provided in 21 U.S.C. 399d(b)(4) (B)(iii).

68.     Plaintiff is further entitled to all relief necessary to make her whole, including but not limited to reinstatement with the same seniority status or front-pay in lieu of reinstatement and back pay with interest, as provided in 21 U.S.C. 399d(b)(4) (B)(i).

69.     Plaintiff is further entitled to recover from Defendant any and all special damages, including but not limited to litigation costs, expert witness fees, and her reasonable attorneys' fees, as provided in 21 U.S.C. 399d(b)(4) (B)(iii).

## COUNT TWO – VIOLATION OF PUBLIC POLICY

70.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

71.     Plaintiff reported to her supervisors what she in good faith and reasonably believed to be unlawful ongoing violations of federal safety standards adopted by OSHA.

72.     The Iowa legislature's adoption of the federal safety standards, codified in Chapter 88 of the Iowa Code, establishes the public policy against retaliating or discharging employees who make complaints regarding safety standards.

73.     It is against the public policy of the State of Iowa to discharge or in any way discriminate against an employee who reports safety issues or who refuses to expose herself or other employees to dangerous working conditions.

74.     It is also against the public policy of the State of Iowa to discharge an employee for reporting what she in good faith and reasonably believed to be unlawful ongoing safety violations.

75.     Defendant's retaliation and discharge of Plaintiff for reporting such safety violations violates Iowa's public policy.

76.     If allowed to go unremedied, Plaintiff's discharge would frustrate the well-recognized and defined public policy of the State of Iowa because it would have a chilling effect

on employees' willingness to exercise their rights and would discourage employees from reporting safety issues and violations.

77.     Plaintiff's protected activities in complaining about safety issues and violations were a determining factor in Defendant's decision to terminate her.

78.     As a result of Defendant's acts and omissions, Plaintiff has in the past, and will in the future, suffer injuries and damages, including but not limited to mental and emotional distress, lost enjoyment of life; and lost wages, benefits and other emoluments of employment.

79.     Plaintiff is entitled to an amount which will fully and fairly compensate her for her injuries and damages, punitive damages in amounts sufficient to punish Defendant and deter Defendant and others from similar conduct in the future, for pre-judgment and post-judgment interest, attorneys' fees, the costs and expenses of this action, and such other relief as may be just in the circumstances and consistent with the public policy of the State of Iowa.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to trial by jury.

Respectfully submitted,

/s/ Aimee Bataillon
Aimee Bataillon, #AT0013007
Fiedler Law Firm, PLC
20615 Hwy 370
Gretna, NE 68028
aimee@employmentlawnebraska.com
Phone: (402) 316-3060
Fax:    (402) 513-6501

Lewis Galloway
*Pro Hac Vice Pending*
LG Law LLC
1600 Genessee St Ste 918
Kansas City, MO 64102
lewis@lglawllc.com
Phone: (816) 442-7002
Fax:    (816) 326-0820

ATTORNEYS FOR PLAINTIFF